FREDERIC et al. v. MERCHANTS & MARINE BANK.

(In Banc. Jan. 27, 1947.)

[28 So. (2d) 843. No. 36314.]

H. W. Gautier, of Pascagoula, for appellants.

**Ford & Ford,** of Pascagoula, for appellee.

Argued orally by **H. W. Gautier**, for appellants, and by Jim Ford, for appellee.

**McGehee, J.,** delivered the opinion of the court.

This is a suit in chancery brought by the appellants, Mr. and Mrs. W. E. Frederic, against the appellee, Merchants and Marine Bank of Pascagoula, Mississippi, to compel the actual and manual delivery of a deed of conveyance executed by the defendant Bank in favor of the complainant, Mrs. W. E. Frederic, on May 22, 1942, and placed in the vault of the bank after its execution and the purchase price paid, for a certain lot which was then vacant and located on the beach front some distance east of the corporate limits of the City of Pascagoula; or that in the event the said original deed could not be produced and delivered unto the grantee, a like deed be ordered executed and delivered in its stead. The bill of complaint also prayed for injunctive relief to restrain the defendant bank from interfering with certain construction work

which was under way on the lot in March 1944, when the suit was filed.

The bank filed an answer denying that there had ever been any delivery of the deed, and a cross-bill asking for a rescission of the transaction, on the ground that a yacht club and bathing pavilion were being constructed on the lot in violation of the terms of the sale thereof.

The trial court denied to the complainants the relief prayed for, and also denied the relief sought by the cross-bill, but ordered the execution and delivery of a deed by the bank with a restriction therein to conform to a certain resolution or recitals which had been entered on the minutes of the board of directors of the bank prior to the execution of the original deed.

It appears from the proof that prior to the sale the defendant bank, as owner of the vacant lot, was desirous of disposing of some realty assets to conform to the requirements of the State Banking Department in that behalf; that the Ingalls Shipbuilding Corporation acquired about 1900 feet of vacant beach frontage, on which there were no improvements except one ante-bellum home, and which frontage extended from within the corporate limits of the City of Pascagoula to about 1300 feet east thereof; that the bank had sought to sell to Mr. Ingalls the lot in question, having a frontage of seventy-five feet along the beach and located east of the Ingalls' tract, but that its negotiation in that behalf had failed; that on April 7, 1942, W. E. Frederic submitted an offer to purchase this lot for $1,500 and delivered to the bank his check for $100, with a notation thereon reading: ''In payment for lot on beach front, balance $1,400 to be paid as approved;'' and that on the next day the board of directors met, and after consideration of the offer, adopted the following resolution or recitals and spread the same on the minutes:

''The President called the Board's attention to the banking department's reference to real estate and suggested that effort be made to sell off some of same men-

tioning that he had written Mr. Ingalls several times in reference to the L. A. Watts lot on beach front, however with no results.

"Definite application for purchase of the Watts lot by W. E. Frederic was submitted with a check for $100.00 attached as initial payment on offer of $1500.00 cash for the lot, Mr. Frederic agreeing to pay the balance in cash as soon as the bank delivered deed to him, and he further explained that the lot would be used to build a home and he expected further to add some tourist cottages, which he said would be well built and operated properly.

"The Board after consideration on motion duly seconded approved sale of the lot to W. E. Frederic for $1500.00 cash instructing that deed be delivered to him for the property and payment accepted."

The proof further discloses that following the entry of the foregoing on the minutes of the board of directors, and the approval of such minutes on May 13, 1942, the attorneys for the bank, at the request of the president, prepared a deed in favor of Mrs. W. E. Frederic for this lot, in compliance with the request of Mr. Frederic that she be named as grantee therein, together with a deed to Mr. Frederic for another lot which was located on Market Street and which he had theretofore purchased from the bank and improved; that these two deeds, containing proper revenue stamps, were both duly executed on May 22, 1942, the $100 check was cashed, and Mr. Frederic was thereupon notified of the execution and readiness of the deeds for delivery; and that at some time shortly following this notification, Mr. Frederic called at the bank and paid the remaining $1400 on the purchase price of the lot in question, having theretofore paid the full amount due on the other lot. That both deeds were thereupon placed in the vault at the bank where they remained until Mr. Frederic commenced the construction of the yacht club and bathing pavilion near the water's edge of the said lot in February, 1944. He was then noti-

fied that the title of this lot still remained in the bank, and he was requested by letter to cease further construction and vacate the property, on the ground that he had thus breached his contract of purchase.

In the meantime, beginning in the year 1942, the Frederics had constructed, with the knowledge and without objection of the bank, three tourist cottages on the lot in question at a cost of approximately $6,000, including the work which had been done on the yacht club and bathing pavilion prior to the filing of this suit.

When the deed was prepared in May, 1942, the president of the bank requested its attorneys not to place any restrictions in the deed, pursuant to his oral agreement with the purchaser who feared that such a restriction might interfere with a resale of the lot in the future; and then, contrary to the advice of the attorneys, the deed was thus prepared and executed and placed in the bank vault for the Frederics without any limitations or restrictions contained therein.

It is the contention of the appellee that there was no delivery of the deed and that therefore the bank is entitled to withhold the same in view of the alleged breach of the recitals of the resolution of the bank directors hereinbefore set forth. On the other hand, it is contended by the appellants that there was an actual delivery of the deed, according to the testimony of Mr. Frederic, and that, if not, there was a constructive delivery thereof, according to the testimony of the president of the bank, and that in either event the bank should be required to deliver the same to the grantee for record, as originally prepared and executed.

Mr. Frederic testified that the deed was handed to him when he called at the bank and paid the remaining $1400 on the purchase price; that he received no receipt or other evidence of this payment aside from the recitals of the deed as to the consideration; and that at his request this deed was placed in the bank vault with the one for the Market Street lot where they both remained, so far as

he knew, until the deed in question was returned to the attorneys of the bank after this controversy arose in February, 1944. On the other hand, the president of the bank testified, upon being introduced as a witness by the complainants, that the deed in question was never handed to Mr. Frederic, who was representing his wife in the purchase of the lot, and that there had been no delivery of said deed.

The trial court resolved this conflict in the evidence—as to whether the deed was ever in the hands of Mr. Frederic—in favor of the defendant bank, and we are not justified in disturbing this finding of fact; but we are of the opinion that under the testimony of the president of the bank, as a whole, there was a legal delivery of the deed, whether actually or constructively, notwithstanding the assertion of the president of the bank, or conclusion from the facts testified to by him, that there was no delivery of the deed.

It was further shown, without dispute, that the bank caused this lot to be removed from its realty tax receipt, as made out by the tax collector for the year 1942, pursuant to the assumption of the taxes for that year by the grantee in this deed, and that the bank shifted to the grantee the burden of paying the taxes likewise for the year 1943, and that the taxes were therefore paid by the Frederics for said years; that also after the execution of the deed, and the placing of the same in the bank vault, this lot was removed from the realty assets of the bank.

Moreover, when Mr. Simmons, a surveyor, went to the bank on behalf of the Frederics in 1942 to get the description from the deed in question for the purpose of surveying the lot prior to the construction of the tourist cottages thereon, the president of the bank says that he gave him the book and page of the recordation of the deed previously executed by L. A. Watts to the bank for this lot, and when asked if he got the deed which the bank had executed to Mrs. Frederic for this lot and showed it to

Mr. Simmons, he answered, that he did not, that ''he didn't ask for it;'' but he was then asked: ''If he had you would have given it to him?'' And his answer was: ''If I had remembered that it was left there I probably would have.'' He was further asked: ''For all you knew, Mr. Frederic had already gotten the deed and put it of record?'' And he answered: ''I didn't know whether he had or not.'' In other words, it is clear that the bank regarded the sale of this lot to Mrs. Frederic as a closed transaction at all times from May 22, 1942, until controversy arose in 1944, and did not in the meantime intend to retain any control over the deed, except as custodian therefor as agent for the Frederics.

The president of the bank was further asked: ''What did Mr. Frederic get for his $1500.00?'' And he answered: ''He was entitled to that deed.'' He was further asked: ''At any time from May 22, 1942, up to March, 1944, had he walked in you would have handed him the deed?'' His answer was: ''As long as I had reason to believe he was carrying out this agreement.'' And he is not alleged to have failed to carry out the agreement at any time prior to 1944, and the bank had been the mere custodian of the deed in the meantime, while it was in the vault subject to be called for at any time by the purchaser.

We are unable to see any difference between the status of this deed, so far as delivery is concerned, while it remained in the bank vault and that of the deed to the Market Street lot, and in regard to that deed the president of the bank was asked: ''Is there any question that this deed to the property on Market Street was never delivered to Mr. Frederic and that he does not own that property and your bank still owns it?'' And he answered: ''Never has been.'' And he was later asked: ''And your recollection is that you had both deeds written at the same time?'' His answer was: ''Yes, that is right. I wanted Mr. Frederic to take the deeds.''

Therefore, for all intents and purposes the deed in question was delivered as written and executed under

the general principles stated in Ladner v. Moran, 190 Miss. 826, 1 So. (2d) 781; Alford et al. v. Henderson et al., 237 Ala. 27, 185 So. 368; Perkins v. Perkins, 206 Ala. 571, 91 So. 256; 26 C.J.S., Deeds, secs. 40, 41, 42, pp. 231, 233 and 238; 16 Am. Jur., Deeds, secs. 108, 110, 120 and 131, pp. 497, 498, 504 and 512. According to the principles announced in the foregoing texts, a manual delivery of the instrument to the grantee is not always required. Delivery may be constructive as well as actual, and it is sufficient if it is apparent either from the words or acts of the grantor that it was his intention to treat the deed as having been delivered.

Moreover, the answer of the defendant bank contains the following: "Defendant admits that until recently it considered that the property belonged to the complainants, because they had paid for it, but defendant did not know that complainants would undertake to violate the agreement."

If the title passed to the grantee, she is entitled to the custody of the deed in order that she may have the same placed of record, without regard to the rights, if any, that the grantor may have because of an alleged breach of the understanding referred to in the minutes of the board of directors, but not incorporated in the deed by the agents of the bank—its president and cashier—as to the purposes for which the property was to be used. Nor is replevin the proper remedy where the litigated question, as here, is the delivery of the deed. Campbell v. Brooks, 93 Miss. 853, 47 So. 545, 20 L.R.A. (N.S.) 507, 17 Ann. Cas. 1017; that is to say, the complainants were entitled to the relief prayed for by this suit in equity, except as to the injunctive relief sought. It is to be presumed that upon the manual delivery of the deed for recordation the bank will recognize the complainants' rights as the adjudicated owners of the property, and will not wrongfully interfere with their use of the same.

Finally, it should be observed that the bank directors did not order that any restriction be placed in the deed

to prevent the use of the lot for any commercial purpose other than the operation of tourist cottages. The resolution merely takes cognizance of Mr. Frederic's explanation that he expected to construct these cottages, and does not undertake to require as a condition of the conveyance that the lot shall not be used for any other commercial purpose. Nor does it provide that the title shall revert to the grantor in the event the grantee should fail to devote the property solely to the purpose mentioned.

Restrictions intended to limit the use of property to a particular purpose should not be left to implication, but should be clearly defined and understood by the parties. "In the absence of a reverter clause, a mere statement in a deed that the land is to be used for a specified purpose is merely a declaration of the purpose of the conveyance, and does not in any way limit the grant." 26 J.C.S., Deeds, sec. 162, pp. 505 and 508. Therefore, if the deed in the instant case had in fact contained the recitals of the resolution in regard to the explanation of the grantee as to the intended use of the lot, such fact would not, without more, entitle the grantor to become reinvested with the title thereto by forfeiture or reverter when the grantee seeks to devote the same to some other purpose.

The Court is of the further opinion that any threatened unlawful use of the property does not affect the status of the title thereto under the facts and circumstances of this case.

The cause will, therefore, be reversed and decree rendered here in favor of the appellants in accordance with the views hereinbefore expressed.

Reversed and judgment here for the appellants.